IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                          CRIMINAL No. **01-1709 MCA**

**LUIS A. CISNEROS**,
**FELIPE N. CISNEROS**,
**PAUL E. EPPINGER**,
**ANGEL R. RIVERA**,
**ARMANDO R. ALVARADO**,
and **ARTHUR QUINTANA**,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the *United States' Motion for Production of DNA and Hair Samples* [Doc. No. 226] filed on December 20, 2002. Having considered the parties' submissions, the applicable law, and being fully advised in the premises, the Court finds that grounds exist for denying the United States' motion without prejudice as set forth below.

## I.    BACKGROUND

Defendants Luis Cisneros, Felipe Cisneros, Paul Eppinger, Angel Rivera, Armando Alvarado, and Arthur Quintana have been indicted [Doc. No. 2, 44, 145] and arraigned in

this matter.  [Doc. No. 92, 103, 123, 125, 156, 157, 165, 166, 167, 169.]  They have been ordered detained pending trial, and they remain in custody as of the date of this *Memorandum Opinion and Order*.  [Doc. No. 54, 93, 103, 137,172, 173.]

The *Third Superseding Indictment* [Doc. No. 145] charges Defendants Luis Cisneros, Felipe Cisneros, Paul Eppinger, Angel Rivera, and Armando Alvarado with numerous offenses, some of which carry a maximum statutory penalty of death, and some of which relate to the alleged murders of Jose Moreno, Sr., and Jose Moreno, Jr. in the Lovington, New Mexico area on January 12, 2000.  The *Third Superseding Indictment* charges Defendant Arthur Quintana with RICO conspiracy and conspiracy to possess with intent to distribute methamphetamine, cocaine, and marijuana.  None of the offenses with which Defendant Quintana is charged carry a maximum penalty of death.

On December 20, 2002, the Government moved for an order compelling the above-named Defendants to provide hair samples and saliva samples containing DNA.  Specifically, the Government requests a minimum of 25 hairs from each Defendant, which are to be obtained by combing.  The saliva samples containing DNA are to be obtained by swabbing the inside of each Defendant's cheek.  (Govt.'s Mot. at 2.)

According to the Government, the purpose of obtaining these samples is to compare them with materials found in a late-model Ford Expedition rental vehicle that allegedly was driven between the Phoenix, Arizona area and the Lovington, New Mexico area around the time of the Moreno murders.  If the samples match those found in the vehicle allegedly used

in relation to the Moreno murders, the Government contends this evidence may serve to incriminate these Defendants.

Although the Government states that it "*could* have gone to a neutral and detached magistrate with a search warrant affidavit and application to attempt to obtain the hair and DNA samples," the Government "is not requesting a search warrant" for this evidence at this time because it maintains that the samples can be obtained simply by "asking for a post-indictment court order that is routine in virtually every case in which forensic physical evidence is implicated." (Govt.'s Reply at 2.) The Government has not cited any specific cases in which such orders were routinely issued, nor has the Government presented any affidavits or other evidence in support of its motion, except to refer in its reply brief to the evidence of record regarding a co-defendant's appeal of a detention order. The reference in the Government's reply brief does not cite any specific portions of the record regarding that appeal that it desires this Court to specifically consider for purposes of this motion. (Govt.'s Reply at 3 n.3.) The Government's motion also does not cite any evidence or authority indicating that the Defendants named in its motion fall within the category of individuals who are routinely subject to DNA testing pursuant to a statute or rule, or whose hair and saliva are routinely collected and analyzed for some programmatic purpose or special need unrelated to law enforcement.

All of the Defendants named in the Government's motion oppose that motion. They claim that obtaining samples of their hair and saliva (containing DNA) for the purpose stated in the Government's motion constitutes a "search" within the meaning of the Fourth

Amendment to the United States Constitution, and that the Government has not made a sufficient showing to justify the search as required under the Fourth Amendment. These Defendants also contend that obtaining samples of their hair will not lead to the discovery of admissible evidence because human-hair comparison is not sufficiently reliable to provide a basis for expert testimony that is admissible under Fed. R. Evid. 702 and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993). In the event that the Court grants the Government's motion, these Defendants request a protective order limiting the purposes for which their hair and saliva samples can be used by the Government.

## II.   <u>ANALYSIS</u>

The Fourth Amendment to the United States Constitution protects Defendants' right to be secure in their persons and effects against unreasonable searches and seizures. Obtaining physical evidence from a person's body may constitute a search within the meaning of the Fourth Amendment "if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable." <u>Skinner v. Ry. Labor Executives Ass'n</u>, 489 U.S. 602, 616 (1989). Accordingly, the Court must first determine whether the collection and testing of a person's hair and saliva (containing DNA) in the manner requested here constitutes such an infringement.

As pretrial detainees, it is reasonable to expect that Defendants' privacy is diminished to a significant degree. For example, they may be subject to some forms of search incident to arrest aimed at preserving evidence that may be destroyed if left in their possession. <u>See, e.g.</u>, <u>Cupp v. Murphy</u>, 412 U.S. 291, 296 (1973) (permitting very limited search necessary

to preserve "highly evanescent evidence" found under a detainee's fingernails); United States v. Edwards, 415 U.S. 800, 803 (1974) (permitting a warrantless seizure of a detainee's clothing approximately ten hours after his arrest). In addition, Defendants may be subject to routine searches for weapons and contraband that are conducted for the purpose of maintaining security in the facilities in which they are detained. See Bell v. Wolfish, 441 U.S. 520, 557 (1979). It does not follow, however, that the Government has unlimited authority to extract from their bodies whatever physical evidence it deems necessary in its efforts to incriminate them on the charges for which they are being detained. See Winston v. Lee, 470 U.S. 753, 759 (1985); Schmerber v. California, 384 U.S. 757, 769-770 (1966); United States v. Miles, 228 F. Supp. 2d 1130, 1137 (E.D. Cal. 2002). Thus, further analysis is required to determine the scope of Defendants' Fourth Amendment rights with respect to the evidence requested by the Government in this case.

"The variety of items of physical evidence which law enforcement officials might seek from an individual's person can best be thought of along a continuum." United States v. Nicolisi, 885 F. Supp. 50, 55 (E.D.N.Y. 1995). At one end of the continuum are "physical characteristics" that are "constantly exposed to the public," United States v. Dionisio, 410 U.S. 1, 14 (1973), such as the characteristics of a person's voice or handwriting. Once a person is lawfully seized, obtaining evidence of such public physical characteristics from that person generally does not constitute a search implicating Fourth Amendment concerns. See id. at 15(voice exemplars); United States v. Mara, 410 U.S. 19, 21 (1973) (handwriting specimens).

At the other end of the continuum are private physical characteristics that can only be revealed by making "intrusions beyond the body's surface." Schmerber, 384 U.S. at 769; see, e.g., Winston, 470 U.S. at 766 (surgical removal of bullet lodged in suspect's chest). With regard to these types of characteristics, "the mere fact of a lawful arrest does not end our inquiry" because "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained." Schmerber, 384 U.S. at 769-770; accord United States v. Weir, 657 F.2d 1005, 1007 (8th Cir. 1981). Where significant health risks may be involved, such a "compelled surgical intrusion into an individual's body for evidence . . . implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime." Winston, 470 U.S. at 759.

Toward the middle of the continuum are physical characteristics, such as bodily fluids, which can be revealed without penetrating beneath the body's surface but which may nevertheless implicate privacy interests protected by the Fourth Amendment based on the method in which the evidence is collected or the "private medical facts" about an individual that can be discovered by analyzing that evidence. Skinner, 489 U.S. at 617. An example of this type of physical characteristic is the contents of a urine sample.

> Such a sample can, like a blood sample, reveal a range of genetic identity features as well as the presence of chemicals within one's system. While the fluid is bound to be expelled, it is not about to be offered to the public domain. Moreover, . . . the method of collection implicates the individual's dignitary interests.

Nicolisi, 885 F. Supp. at 55.  Accordingly, "the collection and testing of urine" has been deemed to be a "search" within the meaning of the Fourth Amendment.  Skinner, 489 U.S. at 617; accord Ferguson v. City of Charleston, 532 U.S. 67, 76 (2001); Chandler v. Miller, 520 U.S. 305, 313 (1997).  It follows that, in the absence of exigent circumstances or some other special need, a search warrant based upon a finding of probable cause generally is required for these types of intrusions, see Skinner, 489 U.S. at 619, even when a person is lawfully detained, see Schmerber, 384 U.S. at 770.

Although arguably less intrusive than urine testing, the collection and testing of saliva samples containing DNA in the manner requested by the Government in this case falls sufficiently toward the middle of the continuum to implicate the kind of privacy and dignitary interests that are protected by the Fourth Amendment and that are not automatically forfeited by virtue of an individual's status as a pretrial detainee.  The Government's preferred method of collecting these samples is to swab the inside of the cheek in a manner analogous to using a toothbrush.  (Govt.'s Mot. at 2.)  Although not as private as the act of urinating, using a toothbrush or swab involves the penetration of a body cavity and is an activity that is customarily conducted in the privacy of a bathroom.  Cf. Skinner, 489 U.S. at 617 (noting  that "the process of collecting the sample to be tested . . . itself implicates privacy interests").  Moreover, the analysis of saliva, like that of urine, "can reveal a host of private medical facts about an" individual.  See id.  Accordingly, the Court concludes that the collection and examination of saliva samples containing DNA in the manner requested by the Government in this case constitutes a search within the meaning of the Fourth

Amendment.  See Schlicher v. Peters, 103 F.3d 940, 942-943 (10th Cir. 1996);  In re Shabazz, 200 F. Supp. 2d 578, 582-83 (D.S.C. 2002); Nicolisi, 885 F. Supp. at 55-56.

Although the issue "has been the subject of controversy in the federal courts," United States v. Anderson, 739 F.2d 1254, 1256 (7th Cir. 1984), the Court assumes for purposes of its analysis of the Government's motion that the collection and testing of hair samples in the manner contemplated here also constitutes a search under the Fourth Amendment, see United States v. Ingram, 797 F. Supp. 705, 716 (E.D. Ark. 1992).  In making this assumption, the Court acknowledges that the characteristics of an individual's hair generally fall more toward the public end of the continuum because an individual's hair is ordinarily exposed, and the method of collecting the hair samples in this case (i.e., combing) does not involve an activity that is customarily performed in private.  See Nicolisi, 885 F. Supp. at 55-56.  Nevertheless, in light of the important interests at stake in this capital case and the likelihood that the Government's analysis of the hair samples in conjunction with the saliva samples may reveal "private medical facts," Skinner, 489 U.S. at 617, the Court will treat the collection and testing of hair samples as a search under the Fourth Amendment for purposes of the Government's motion.

The Court next addresses whether the Government's request for hair and saliva samples containing DNA is "unreasonable" within the meaning of the Fourth Amendment. The general rule is that, in the absence of exigent circumstances or some other special need, a search is unreasonable under the Fourth Amendment unless it is obtained pursuant to a search warrant based upon a finding of probable cause.  See Vernonia Sch. Dist. 47J v.

Acton, 515 U.S. 646, 653 (1995); Skinner, 489 U.S. at 619; Schmerber, 384 U.S. at 770.  In

this case, the Government has not obtained or requested a search warrant and its motion

presents no grounds for concluding that the type of information the Government seeks to

extract from the hair and saliva samples is likely to dissipate before a warrant could be

obtained.  Accordingly, the Court's analysis shifts to whether the Government has shown

that the proposed search fits within the category of searches that are deemed constitutionally

permissible by virtue of "'special needs, beyond the normal need for law enforcement,

[which] make the warrant and probable-cause requirement impracticable.'"   Griffin v.

Wisconsin, 483 U.S. 868, 873 (1987) (quoting New Jersey v. T.L.O., 469 U.S. 325, 351

(1985) (Blackmun, J., concurring in judgment)); accord Skinner, 489 U.S. at 619.

The Supreme Court has recognized an exception to the warrant requirement based on

such "special needs" in cases of urine testing of railway employees involved in train

accidents, see Skinner, 489 U.S. at 633-34, United States Customs Service employees

seeking promotion to certain sensitive positions, see Treasury Employees v. Von Raab, 489

U.S. 656, 665-66 (1989), high-school students participating in interscholastic sports, see

Acton, 515 U.S. at 653, and high-school students participating in other competitive, school-

sponsored extracurricular activities, see Bd. of Educ. of Indep. Sch. Dist. No. 92 of

Pottawatomie County v. Earls, 536 U.S. 822, 122 S. Ct. 2559 (2002).  In each of those cases,

the Supreme Court "employed a balancing test that weighed the intrusion on the individual's

interest in privacy against the 'special needs' that supported the [testing] program."

Ferguson, 532 U.S. at 78.

-9-

Applying a similar balancing test, the Fourth and Ninth Circuits have upheld statutory schemes which require the routine collection and storage of DNA samples from certain categories of convicted felons.  See Jones v. Murray, 962 F. 2d 302, 305-08 (4th Cir. 1992); Rise v. Oregon, 59 F.3d 1556, 1559 (9th Cir. 1995).  In reaching this result, the Fourth and Ninth Circuits reasoned that such statutes did not violate the Fourth Amendment even if they served general law enforcement needs rather than the category of "special needs" recognized by the Supreme Court in the urine-testing cases cited above.  See Rise, 59 F.3d at 1559; Jones, 962 F.2d at 307 n.2.  The Tenth Circuit found this reasoning persuasive when it upheld a similar statutory scheme in Colorado.  See Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1996).  Subsequent Tenth Circuit rulings on this issue have relied on the rationale supplied in Boling.  See Schlicher, 103 F.3d at 942; Shaffer v. Saffle, 148 F.3d 1180, 1181 (10th Cir. 1998).

Since Boling, Jones, and Rise were decided, however, the Supreme Court and the Tenth Circuit have recognized that there are limits to the "special needs" exception and the balancing test associated with that exception.  See Ferguson, 532 U.S. at 84; Chandler, 520 U.S. at 318; Roska v. Peterson, 304 F.3d 982, 997 (10th Cir. 2002), reh'g granted in part, 2002 WL 32001511 (10th Cir. Nov. 5, 2002).  These limits preclude this Court from using the reasoning employed in Jones, Rise, or Boling to justify a warrantless search for hair and saliva samples containing DNA in this case.  See Miles, 228 F. Supp. 2d at 1135-37.

In Ferguson, 532 U.S. at 84, the Court concluded that a hospital program of testing a pregnant patient's urine for the presence of illegal drugs "did not fit within the closely

-10-

guarded category of 'special needs'" given that law enforcement officials were extensively involved in the program and the primary purpose of the program "was to use the threat of arrest and prosecution in order to force women into treatment."  And in <u>Chandler</u>, 520 U.S. at 309, 318, the Court concluded that a drug-testing program applicable to candidates for state office did not "fit within the closely guarded category of constitutionally permissible suspicionless searches" because the state had "failed to show . . . a special need."

Underlying the analyses in these cases is the recognition that, although the subjective motivations of law enforcement officers ordinarily are not relevant to determining the reasonableness of a search under the Fourth Amendment, <u>see</u> <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996), certain "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion," <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 45-46 (2000).  Thus, in determining whether these types of intrusions are unreasonable under the Fourth Amendment, it is important for courts to conduct a "close review" of the primary governmental purpose for which the evidence resulting from the search is sought.  <u>See</u> <u>Ferguson</u>, 532 U.S. at 81.

In each of the cases where the Supreme Court has upheld warrantless and suspicionless urine-testing programs, "the 'special need' that was advanced as a justification for the absence of a warrant or individualized suspicion was one *divorced from the State's general interest in law enforcement*."  <u>Id.</u> at 79 (emphasis added).  The Supreme Court has never approved a general program of suspicionless and warrantless searches of this nature

"whose primary purpose was to detect evidence of ordinary criminal wrongdoing." Edmond, 531 U.S. at 41.  On the contrary, "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing," the Supreme Court has steadfastly maintained that "reasonableness generally requires the obtaining of a judicial warrant." Acton, 515 U.S. at 653; accord Earls, 122 S. Ct. at 2564; Ferguson, 532 U.S. at 85-86; Van Raab, 489 U.S. at 665;  Skinner, 489 U.S. at 619; Winston, 470 U.S. at 760-61; Schmerber, 384 U.S. at 770.

The Tenth Circuit has further recognized that "[i]n all special needs cases, the nature of the need addressed makes particularized suspicion impossible or otherwise renders the warrant requirement impractical."  Roska, 304 F.3d at 997.  In reaching this conclusion, the Tenth Circuit expressly noted the limits on the "special needs" exception stated in Ferguson and Earls.  See Roska, 304 F.3d at 997 n.15.

In the present case, the Government has not asserted a special need to collect and test samples of Defendants' hair and saliva containing DNA for a programmatic purpose that is divorced from its general interest in law enforcement, nor has the Government explained why the warrant requirement is impractical.  Further, unlike the individuals at issue in Boling, 101 F.3d at 1339, the Government has not shown that the Defendants it seeks to search are inmates convicted of offenses that require DNA sampling pursuant to statute.  Rather, the record before the Court only indicates that these Defendants are pretrial detainees, and that the purpose of collecting and testing samples of their hair and saliva is to uncover evidence that may incriminate them regarding the charges for which they are being detained pending

trial in this case.  For these reasons, the search requested here cannot be justified by reference to the "special needs" balancing test or some variation of that test applicable to persons in custody.  Instead, the general requirement of obtaining a search warrant based upon a showing of probable cause applies.

The Court acknowledges that the requirements for obtaining a search warrant after an indictment has been filed may differ to some degree from the requirements that would ordinarily apply before a grand jury has made a finding of probable cause to proceed with criminal charges.  As the Defendants are pre-trial detainees pursuant to indictments issued by the Grand Jury and detention orders issued by United States Magistrate Judges, the Government is not required to again demonstrate, in the context of an application for a search warrant, that each Defendant is justifiably detained or that there exists probable cause to believe that each Defendant committed the crimes with which he is charged.  The indictments and the detention orders already demonstrate that these prerequisites have been satisfied.  See Anderson, 739 F.2d at 1256.

In addition, the requirements for obtaining a search warrant may differ from the requirements for admitting evidence at trial.  Thus, in applying for a search warrant for hair samples, the Government does not necessarily need to show that a particular method of human-hair analysis or comparison meets the requirements of reliability and relevance under Fed. R. Evid. 702 and Daubert, 509 U.S. at 591-93.  These evidentiary requirements do not apply in proceedings for issuance of search warrants.  See Fed. R. Evid. 1101(d)(3); United States v. McCoy, 781 F.2d 168, 172 (10th Cir. 1985).

Nevertheless, in order to establish grounds for the issuance of a search warrant, the Government must show, by affidavit or sworn testimony, that there are sufficient underlying facts and circumstances from which to reasonably infer some connection which links the Moreno murders (or other crimes charged in the *Third Superseding Indictment*) to the evidence found in the Ford Expedition and the evidence likely to be derived from Defendants' hair and saliva samples.  See Fed. R. Crim. P. 41; Anderson, 739 F.2d at 1256.  The Government also must show that the means and procedures employed in taking the samples they wish to collect will respect relevant Fourth Amendment standards of reasonableness.  See Schmerber, 384 U.S. at 768.  Lacking a supporting affidavit or citations to specific portions of the record establishing such underlying facts and circumstances, the United States' motion is not sufficient to make these required showings.  See Fed. R. Crim. P. 41; cf. D.N.M. LR-Civ. 7.5(b) ("Movant must submit evidence, in the form of affidavits, deposition excerpts, or other documents, in support of allegations of fact."); D.N.M. LR-Crim. 16.3 (applying the provisions of D.N.M. LR-Civ. 7.5 to motions in criminal cases).

## III.   CONCLUSION

For the foregoing reasons, the Government's motion must be denied.  As there is nothing to preclude the Government from seeking a search warrant for the hair and saliva samples containing DNA that are at issue here, the denial of that motion is without prejudice.

**IT IS THEREFORE ORDERED** that *United States' Motion for Production of DNA and Hair Samples* [Doc. No. 226] is **DENIED WITHOUT PREJUDICE**.

**SO ORDERED** this 17th day of March, 2003, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**

-15-