**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                          No.  CR 01-1709 MV

LUIS A. CISNEROS, et al.,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on the United States' Motion to Dismiss Third Superseding Indictment Without Prejudice ("Motion to Dismiss"), filed July 17, 2003 **[Doc. No. 433]**, and the United States' Motion to Stay Proceedings and Discovery ("Motion to Stay"), filed July 17, 2003 **[Doc. No. 432]**.  The Court, having considered the motions, briefs, relevant law and being otherwise fully informed, finds that the Motion to Dismiss is well taken and will be **GRANTED**, and that the Motion to Stay will be **DENIED** as moot.

**BACKGROUND**

On December 20, 2001, a federal grand jury in Las Cruces, New Mexico returned a one-count Indictment charging Armando Alvarado with conspiracy to possess controlled substances with the intent to distribute.  The matter was assigned to Judge M. Christina Armijo as the judge then assigned to the Las Cruces rotating docket.  On April 17, 2002, the Indictment was superseded to expand the period of the alleged conspiracy.  On September 19, 2002, a Second Superseding Indictment was returned which added nine defendants and sixteen counts including eight capital counts alleging racketeering, interstate murder for hire and murder of a witness.

Thereafter, on September 23, 2002, the government moved to transfer the matter from the Las Cruces docket to the Albuquerque docket. Judge Armijo granted the government's motion on September 26, 2002. On November 15, 2002, a federal grand jury returned a Third Superseding Indictment (the "New Mexico Indictment"). The Third Superseding Indictment added no new charges but included a Notice of Special Findings as to each death penalty-eligible Defendant relating to the mental state of each such Defendant at the time of the alleged capital offenses and the existence of any statutory aggravating factors.

In or about April 2003, Defendants developed what they describe as "a series of concerns about the apparent lack of impartiality of Judge Armijo." Because of these concerns, upon notice to the government, Defendants asked Judge Armijo for an informal meeting which would be on the record but under seal. Judge Armijo scheduled a meeting for April 25, 2003. Rather than meet with counsel herself, however, "[b]ecause of the highly unusual nature of defense counsel's request," Judge Armijo asked Chief Judge James Parker to conduct the meeting. Sealed Memorandum Opinion and Order dated May 6, 2003 at 1. At the April 25, 2003 meeting with Judge Parker, Defendants' attorneys made an informal request that Judge Armijo voluntarily recuse herself from this matter. In support of their request, Defendants' attorneys explained that they had concluded that Judge Armijo was "laboring under the belief that those Defendants, our clients, pose a serious threat to the Court and to court personnel." Transcript of April 25, 2003 meeting ("4/25/03 Tr.") at 6. This conclusion was based in part upon the fact that the United States Marshal's Service presented a security briefing which the entire Albuquerque courthouse staff was required to attend, showing slides of Defendants and their associates and providing warnings for staff to take special precautions to prevent violence at the hands of Defendants and

their associates.  In addition to the security briefing, Defendants cited specific security measures

that Judge Armijo had taken since this case was assigned to her, including: requesting that her

chambers' locks be changed; requesting that bulletproof glass be installed; ordering changes in the

schedule for the cleaning of her office to prevent access after hours; instructing the Marshal's

Service to open her mail; preventing cellular telephones from being brought into her courtroom

and placing a metal detector outside the doors to her courtroom.  Defendants explained that

objective third parties considering these measures "would have to conclude that this judge has

significant and really quite atypical fears for her own safety and maybe for the safety of others

here at the courthouse, and in such a way that we believe she cannot provide for us the fair and

impartial trial to which these Defendants are entitled."  4/25/03 Tr. at 11.  At the conclusion of

the meeting, Judge Parker arranged for a transcript of the meeting to be provided under seal to

Judge Armijo and directed Defendants' attorneys to provide Judge Armijo and the government

with the legal authorities upon which they relied in making their informal request for recusal.

        In a Sealed Memorandum Opinion and Order dated May 6, 2003 ("May 6th Opinion"),

Judge Armijo determined that the courthouse security measures raised by Defendants did not

provide grounds for recusal and thus *sua sponte* found that she was obliged not to recuse herself.

Judge Armijo explained that the security measures cited by Defendants, to the extent that such

security measures actually were taken, were motivated not "by a perception that Defendants are

dangerous," but rather in order "to protect the confidentiality of information."  May 6th Opinion

at 23.  In light of Defendants' concern that their alleged grounds for recusal "are likely to be

particularly disruptive to the Court and are likely to generate pretrial publicity that is unfairly

prejudicial to Defendants if they are publicly disclosed," and because "some of the allegations

relate to internal building-wide security issues that are not specifically connected to this case," Judge Armijo granted Defendants' request to conduct recusal proceedings under seal. *Id.* at 11-13.  Judge Armijo found that placing Defendants' request under seal under certain conditions was "narrowly tailored to protect the effectiveness of the Court's internal security measures, the confidentiality of internal communications among court personnel, and Defendants' right to a fair trial in this matter." *Id.* at 13.  One specified condition was that the Court's decision to place Defendants' request under seal would remain subject to reconsideration at a later date.  *See Id.*

Following the May 6th Opinion, on May 14, 2003, a Sealed Motion by Seven Accused for the Recusal of the Honorable M. Christina Armijo ("May 14th Motion") was filed.  In the May 14th Motion, Defendants reiterate that Judge Armijo requested a series of extraordinary changes and measures which were concealed from Defendants and which were motivated by her "personal and baseless fear that one or more of the named accused would try to harm her."  May 14th Motion at 4.  Defendants reconfirm their position that Judge Armijo's actions reflect bias against the accused and that "an objective, disinterested person who is fully informed of the present facts must conclude that it reasonably appears that the Honorable M. Christina Armijo harbors an improper bias against the accused." *Id.* at 8.

The affidavits supporting the May 14th Motion make clear that Defendants' attorneys discovered Judge Armijo's allegedly concealed security measures at least in part through conversations with confidential sources who are identified as courthouse employees. *See, e.g.,* Affidavit of Defendants, Affidavit of Billy R. Blackburn and Affidavit of Kari Converse, annexed to the May 14th Motion as Exhibits B, D and E, respectively.  For example, Mr. Blackburn's Affidavit contains the following paragraphs:

6.     I have spoken to several courthouse employees concerning the above-mentioned slide show presentation.  Each and every one of the employees has spoken to me in confidence, because they fear retaliation if they speak publicly about what occurred in February 2003 at the courthouse.  The confidential sources fear that they will lose their jobs if it comes known that they have spoken to any of the attorneys about the slide show and, furthermore, any of the extra security measures that have been implemented by the Honorable M. Christina Armijo.

7.     As a result of the conversations that I had with the individuals listed in paragraph 6 above, I was informed that this was not the first incident concerning different and unusual security matters as it relates to the Honorable M. Christina Armijo.  I was informed that Judge Armijo had the locks changed on the doors to her chambers.  I was also informed that Judge Armijo changed how she normally receives her mail.  I have been informed that, as a result of the above case and due to fear of the Defendants, Judge Armijo has directed all hand delivered mail be delivered to the Marshal's Office.  Upon information and belief, the Marshal's Office then inspects the mail and delivers it to Judge Armijo.  I also was informed by the individuals listed in paragraph 6 above that due to the fears of the Defendants and their associates, Judge Armijo has requested that special bulletproof glass be installed in the windows in her chambers and courtroom.  Furthermore, I have been informed that Judge Armijo has requested personal security twenty-four hours a day as it relates to her fears of the Defendants in the above-entitled and numbered cause.

Affidavit of Billy R. Blackburn, sworn to May 13, 2003, at 3-4.

In a Sealed Memorandum Opinion and Order dated June 13, 2003[1] ("June 13th Opinion"),

Judge Armijo denied the May 14th Motion, finding no merit to Defendants' assertion that court

security measures employed in this case provided grounds for her recusal.  Specifically, Judge

Armijo found that, to the extent that Defendants' allegations were accurate, such allegations did

no more than:

reveal the presence of a limited number of security measures which closely relate to legitimate governmental interests that arise in the course of [her] official duties as a judge, such as maintaining custody over defendants, protecting privileged or

---

[1]The June 13th Opinion was not entered on the docket or made available to the parties until June 16, 2003.

confidential information from improper disclosure, and ensuring the safety and
security of all persons in and around the courtroom.

June 13th Opinion at 23.  Judge Armijo also noted that it was ironic that Defendants questioned
"the reasonableness of measures taken to protect confidential and sensitive documents and
information" while at the same time "attempting to exploit their 'unnamed sources' within the
courthouse in order to obtain confidential information about the case."  *Id.* at 30.  With regard to
defense counsel's communications with such confidential sources, Judge Armijo further noted
that:

> It is clear from the nature of the allegations made that the information allegedly
> disclosed to defense counsel was not disclosed in the context of such employees'
> official duties and responsibilities. . . . The very fact that such *ex parte*
> communications outside of normal channels may be occurring itself raises concerns
> about ongoing inappropriate solicitation and disclosure of information as to this
> case.  Further, such *ex parte* communications raise legitimate concerns as to the
> potential for compromise of overall building/facilities security.

*Id.* at 36.

Although Judge Armijo denied the May 14th Motion, she nevertheless voluntarily recused
herself from this matter.  Her recusal was based upon her *sua sponte* consideration of the "unique
and extraordinary circumstances of [Defendants'] efforts to seek [her] recusal," including "the
questionable manner or means by which Defendants [sought] to establish the reliability of [their]
allegations through 'unnamed confidential sources.'"  *Id.* at 35-36.  Judge Armijo concluded that
such extraordinary circumstances "present[ed] a climate that [had] forced [her] into an
exceptionally adversarial position with [Defendants] in this case" and as a result found "that this
situation could reasonably create the perception of bias or prejudice with respect to future
proceedings in this case."  *Id.* at 37.

Judge Armijo granted Defendants' request for the recusal motion and attendant pleadings to be placed under seal, subject to reconsideration regarding the propriety of their disclosure at a later date.  Specifically, Judge Armijo stated:

> because some of the allegations relate to internal building-wide security issues that are not specifically connected to this case, the Court finds that good cause exists for considering defense counsel's motion under seal at this time, and that placing this request under seal is narrowly tailored to protect the effectiveness of the Court's internal security measures, the confidentiality of internal communications among court personnel, and Defendants' right to a fair trial in this matter.

*Id.* at 37.

On June 16, 2003, this matter was transferred and reassigned to this Court.  On June 26, 2003, this Court set a status conference for July 8, 2003.  On June 30, 2003, the government filed a motion to continue the status conference, stating that both assistant United States attorneys working on this matter had previously-scheduled trips, one out of the country and one out of the state.  The Court held a telephone conference on July 2, 2003 for the purpose of setting a new date for the status conference.  Based on that telephone conference, the Court rescheduled the status conference for July 14, 2003.

At the status conference before this Court on July 14, 2003, for the first time, the government disclosed to the Court and Defendants that on July 11, 2003, a federal grand jury in Phoenix, Arizona had returned a thirty-two count Indictment against all ten Defendants in this case as well as three additional defendants (the "Arizona Indictment").  The Arizona Indictment includes the charges in the New Mexico Indictment and adds twenty-two new counts.  After making this disclosure, the government orally moved the Court to dismiss the New Mexico Indictment.  The Court directed the government to file a written motion setting forth its request.

The instant Motion to Dismiss and Motion to Stay followed on July 17, 2003.  On July 28, 2003, Defendants filed a response in opposition to the Motion to Dismiss.  On July 30, 2003, the government filed a reply to Defendants' response to the Motion to Dismiss and a sealed supplement to its reply.  Thereafter, on August 14, 2003, the government filed a second sealed supplement to its reply.

On July 30, 2003, the government filed a Motion to Unseal All Documents Relating to Recusal of United States District Judge M. Christina Armijo and All Documents Relating to United States' Motion to Dismiss Third Superseding Indictment Without Prejudice **[Doc. No. 443]** ("Motion to Unseal").  Defendants filed their sealed response in opposition to the Motion to Unseal on August 12, 2003.  The government filed its sealed reply papers in further support of the Motion to Unseal on August 14, 2003.

On August 15, 2003, the Court held an evidentiary hearing.  At the conclusion of the hearing, the Court denied the Motion to Unseal.  The Court took under advisement the Motion to Dismiss and the Motion to Stay.

## STANDARD

Motion to Dismiss

Rule 48(a) of the Federal Rules of Criminal Procedure requires the government to obtain leave of the court before filing a dismissal of an indictment. Specifically, Rule 48(a) provides:

> The Attorney General or the United States attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate.  Such a dismissal may not be filed during the trial without the consent of the defendant.

The Supreme Court has explained that the "principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.,* charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Rinaldi v. United States*, 434 U.S. 22, 30 n.15 (1977). Rule 48(a) also allows the court "to consider the public interest in the fair administration of criminal justice and the need to preserve the integrity of the courts." *United States v. Carrigan*, 778 F.2d 1454, 1463 (10th Cir. 1985); *see also United States v. Strayer*, 846 F.2d 1262, 1265 (10th Cir. 1988).

In determining whether prosecutorial harassment exists, the key factor is "the propriety or impropriety of the Government's efforts to terminate the prosecution – the good faith or lack of good faith of the Government in moving to dismiss." *United States v. Salinas*, 693 F.2d 348, 351 (5th Cir. 1982). In other words, the government "must not be motivated by considerations 'clearly contrary to the public interest.'" *Id.* Motions to dismiss that are motivated by considerations clearly contrary to the public interest have been described as those "in which the prosecutor appears motivated by bribery, animus towards the victim [of the alleged crime], or a desire to attend a social event rather than trial." *In re Richards*, 213 F.3d 773, 787 (3rd Cir. 2000) (citing *United States v. Hamm*, 659 F.2d 624, 630 (5th Cir. 1981)).

The court is "vested only with limited supervisory power over prosecutorial charging decisions specifically under Rule 48(a)." *United States v. Robertson*, 45 F.3d 1423, 1437 n.14 (10th Cir. 1995), *cert. denied*, 516 U.S. 844 (1995). Courts of appeal are in agreement that "refusal to dismiss is appropriate only in the rarest of cases." *In re Richards*, 213 F.3d at 786. Rule 48(a) is intended to provide a check on the absolute power of the executive branch which nonetheless "remains the absolute judge of whether a prosecution should be initiated and the first

and presumptively the best judge of whether a pending prosecution should be terminated."

*United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975), *cert. denied sub nom.*, *Woodruff v.*

*United States*, 425 U.S. 971 (1976).  Accordingly, the government's discretion "with respect to

the termination of pending prosecutions should not be judicially disturbed unless clearly contrary

to manifest public interest." *Id.*  The Tenth Circuit has adopted this rule, holding that the court is

"generally required to grant a prosecutor's Rule 48(a) motion to dismiss unless dismissal is

'clearly contrary to manifest public interest.'" *Carrigan*, 778 F.2d at 1463 (citation omitted); *see*

*also Strayer*, 846 F.2d at 1265.

In reviewing the government's motion to dismiss, the court must begin with the

presumption that the prosecutor is the best judge of the public interest and that he or she acted in

good faith in moving to dismiss the indictment.  *See Salinas*, 693 F.2d at 352.  This presumption

is rebutted upon an evidentiary showing that the motion is not made in good faith.  *Id.*  The

government does not bear the burden of proving that dismissal is in the public interest.  *Id.*  The

government, however, is obligated to provide its "reasons for seeking to dismiss the indictment

and the facts underlying the prosecutor's decision."  *United States v. Derr*, 726 F.2d 617, 619

(10th Cir. 1984).  The government's reasons must "constitute more than 'a mere conclusory

interest.'"  *Salinas*, 693 F.2d at 352.  Based upon the government's statement of reasons and the

defendant's response, "the court should determine whether the presumption of good faith is

overcome by 'an affirmative reason to believe that the dismissal motion was motivated by

considerations contrary to the public interest.'"  *United States v. Welborn*, 849 F.2d 980, 984 (5th

Cir. 1988) (citation omitted).

## DISCUSSION

I.      <u>Motion to Dismiss</u>

For the first time in a federal death penalty case, the government invokes Rule 48(a) to seek dismissal of an indictment against Defendants in one district so that a broader indictment against the same Defendants may proceed in another district.   The government sets forth three reasons for its Motion to Dismiss, each of which it claims is asserted in good faith and is independently sufficient to justify dismissal: security concerns, changes in the Arizona Indictment and practical considerations.

Defendants contend that the government's stated reasons for seeking dismissal of the New Mexico Indictment are pretextual and that the circumstantial evidence demonstrates that the government's true motive is to have this case tried before a judge other than the assigned judge. According to Defendants, the presumption of good faith afforded the government is rebutted because the Motion to Dismiss does not contain a sufficient factual basis to justify dismissal and constitutes prosecutorial harassment.  In support of its allegations of prosecutorial harassment, Defendants contend that the motion constitutes forum shopping, re-exposes Defendants to the death penalty, violates Defendants' rights to a speedy trial and to a speedy indictment, violates Defendants' right to be tried in a proper venue and interferes with Defendants' right to effective assistance of counsel.  In addition, Defendants argue that the Motion to Dismiss is inconsistent with the fair administration of justice for the same reasons that they cite as evidence of prosecutorial harassment.

A.      The Government's Stated Reasons for the Motion to Dismiss

      1.      Security Concerns

The government contends that, since the commencement of this case, its tactical decisions have been informed by concerns regarding the potential security risks posed by Defendants. According to the government, its security concerns began as early as the filing of the Second Superseding Indictment, when it first became apparent that some of the Defendants herein have lengthy criminal histories and hold high-ranking positions in the New Mexican Mafia, a criminal organization centered around prison gangs in Arizona.  Given the background of these Defendants and the fact that the New Mexico Indictment alleges capital crimes including the murder of witnesses, the government instituted security measures designed to protect the attorneys prosecuting this action, including secured parking, security at their homes and permission for them to carry firearms.  Also because of these concerns, the government explains, it requested that this case be transferred from Las Cruces to Albuquerque where the courthouse has a higher security rating.

Before the reassignment of this case, the government made its security concerns known to the Court in both unsealed and sealed *ex parte* pleadings.  For example, in a pleading filed on December 9, 2002, the government argued,

> Even among death penalty cases, the present case is exceptional because of its history of murdered potential witnesses and the threat to current potential witnesses.  The trail of the dead bodies of murdered potential witnesses against the organization described in the Third Superseding Indictment is undeniable. . . . Just as undeniable . . . is the threat against current witnesses and the fear under which these witnesses live every day of their lives.

Government's Response to Defendant Eppinger's Supplemental Memorandum in Reply to Prosecution's Response to Motion to Ensure Fair and Reasonable Amount of Time for Defense to Review Discovery Before Government Decides Whether to Seek Death Penalty and Request for Emergency Hearing at 6-7.  Similarly, in a pleading filed on January 24, 2003, the government wrote,

> First, the capital defendants in this case are high ranking members of organized criminal enterprises that have an ongoing ability to perpetrate violence against potential witnesses.  Second, the history of murders related to this case cannot be ignored.  Defendants may argue that the multiple murders of individuals who also happened to be witnesses against them are merely "coincidental."  The circumstances and frequency of these murders, however, indicate that people were murdered to prevent them from testifying against various Defendants in this case.

Government's Response to Defendants' Motion for Immediate Production of Discovery at 5.

Again, in a pleading filed on February 21, 2003, the government stated,

> Like no other in the history of this district, this case features the systematic disappearance of potential witnesses.  The trail of dead potential witnesses, most of whom were shot in the head, against [the Cisneros] Organization numbers at least eight.  In ordering Defendant Lorena Cisneros detained, this Court heard substantial evidence about the Organization's use of telephones and coded language to facilitate the silencing of witnesses.  This Court learned that each of the defendants who have joined in this motion have participated in such calls.

United States' Response to Defendants' Motion and Memorandum to End Unconstitutional Conditions of Confinement at 5.  The government's security concerns were reiterated in its response to the May 14th Motion for recusal of Judge Armijo, where it stated that, given the background of Defendants and the sensitive nature of the sealed pleadings filed in this action, the security measures taken by Judge Armijo reflected "rational, prudent thinking."  United States' Sealed Response to May 14th Motion at 16.

As set forth above, during the April 25, 2003 meeting with Judge Parker, the government first heard that Defendants' attorneys might have received confidential information from courthouse personnel.  Thereafter, on May 14, 2003, the government read in the affidavits supporting the May 14th Motion that Defendants' attorneys had discovered Judge Armijo's allegedly concealed security measures at least in part through conversations with confidential sources who were identified only as courthouse employees.  The government alleges that, between May 15, 2003 and May 30, 2003, the Marshal's Service contacted the United States' Attorneys Office and expressed "an extreme amount of concern" about these potential leaks from courthouse personnel.  Then, on June 16, 2003, the government received the June 13th Opinion, wherein, as set forth above, Judge Armijo discussed in detail defense counsel's receipt of information about internal, non-public court operations from confidential sources and found that such communications raised "legitimate concerns as to the potential for compromise of overall building/facilities security."  June 13th Opinion at 36.  The government describes Judge Armijo's findings as "pretty strong findings from an Article III judge."  Simultaneously with the receipt of potential information regarding leaks in the courthouse, the government explains that, on June 3, 2003, it also learned that three of the Defendants incarcerated in New Mexico were engaged in an alleged plot to murder Detective Michael Maya, the government's lead investigator in Arizona.

According to the government, it was in the context of their long-standing security concerns and the discovery of the alleged plot to murder Detective Maya that it assessed the danger of potential information leaks in the courthouse.  Specifically, the government was concerned that the security precautions it believed to be necessitated by the dangerousness of Defendants -- which dangerousness was underscored by the newly discovered alleged murder plot

-14-

-- would not be effective if there were leaks.  Since the identity and location of the confidential

sources were unknown, it was impossible to know what steps needed to be taken to stop the

potential leaks.  Accordingly, the government concluded that the potential leaks were an incurable

lapse in security and that the District of New Mexico was no longer a safe and secure venue in

which to try this case.  Based on this conclusion, the government explains, it determined that it

would be in the public interest to dismiss the New Mexico Indictment and pursue this case in the

District of Arizona, in a safe and secure courthouse which had not been compromised, would not

expose witnesses to danger and which has a higher security rating than the courthouses in New

Mexico.

      Defendants contend that the timing of the Motion to Dismiss, which the government

brought only after this case was transferred to this Court, creates an inference that the

government's alleged security concerns are no more than a pretext for its desire to have this case

tried before another judge.  Specifically, Defendants point out that although the government was

on notice as early as April 25, 2003 of potential leaks in the courthouse, while this case was still

before Judge Armijo the government failed to raise the issue of the potential danger posed by

these leaks.  Indeed, Defendants note, the government did not even mention this issue in their

response to the May 14th Motion despite the fact that the affidavits attached as exhibits to that

motion clearly disclosed the fact of defense counsel's confidential sources.  It was not until the

July 14, 2003 status conference before this Court that the government suggested that these

potential leaks raised questions about whether the District of New Mexico is an appropriate forum

in which to continue prosecution of this case.  Defendants submit that if the government truly had

security concerns, it would not have waited until July 14, 2003 to make those concerns known to

the Court.  Defendants further submit that if the government's concerns were sparked by the disclosure of the potential information leaks rather than by the transfer of this case, the government would have produced direct evidence predating the reassignment to this Court.

Defendants also challenge the government's depiction of the dangerousness posed by Defendants which depiction forms the contextual background for the government's argument regarding the importance of the potential security leaks.  According to Defendants, the government's concerns about them are "unsubstantiated, shop-worn and grossly exaggerated." Specifically, Defendants contend that the government consistently has alleged that Defendants pose a threat to the safety of witnesses based upon the fact that a "chop shop" case was brought in Arizona in 1997 against Defendants Luis Cisneros and Felipe Cisneros but was dismissed because three of the state's witnesses were murdered.  According to Defendants, there is no hard evidence that any of the Defendants were involved in the death of those witnesses.  Moreover, Defendants contend, they have yet to be given an opportunity to rebut the government's repeated claims that they were responsible for those deaths as they have been provided no discovery pertaining to these claims.   Finally, Defendants note that their behavior while incarcerated is inconsistent with any serious concern about security.

The Court agrees with Defendants that the timing of the government's motion raises legitimate concerns.  The government's explanations, however, are sufficient to dispel the concerns raised by the timing of the Motion to Dismiss.

As a preliminary matter, the government notes that if it really were dissatisfied with Judge Armijo's recusal and the subsequent transfer of this case, it could have taken the routine step of

-16-

appealing the June 13th Opinion in which Judge Armijo recused herself.  The government did not

choose to appeal.

      Next, with regard to the lapse of time between its discovery of the potential information

leaks and its motion, the government explains that when it first learned about the potential leaks,

it did not know how best to proceed and that the decision to seek dismissal was neither an instant

decision nor a decision made by the government's New Mexico office alone.  Rather, the

government explains, several internal meetings were held, first within the United States Attorneys'

Office in New Mexico, then with the United States Attorney in Arizona and finally with the

Deputy United States Attorney General's Office in Washington, D.C.   Ultimately, on July 1,

2003, the United States Attorneys for the District of New Mexico and the District of Arizona

made a joint written request to United States Attorney General John Ashcroft for permission to

seek an indictment of Defendants in Arizona and thereafter dismiss the pending New Mexico

Indictment.  The written request explains:

> The same security concerns that led Judge Armijo to recuse herself still exist and
> have not been ameliorated.  Combined with other security concerns, the need to
> file additional charges, and certain practical considerations, we believe that the
> only federal district in which this case now can be tried safely and efficiently is the
> District of Arizona.

Letter from David C. Iglesias and Paul K. Charleton to the Honorable John Ashcroft, dated July

1, 2003.  The request does not mention the transfer of the case to this Court.  Attorney General

Ashcroft responded to Mr. Iglesias in a letter dated July 14, 2003, authorizing him to dismiss the

New Mexico Indictment.  While the government has disclosed both its request to the Attorney

General and the Attorney General's response, the government has explained that, under the

deliberative process privilege, it is not in a position to disclose internal documents regarding the decision-making process that led up to its request.

With regard to its failure to raise the issue of security concerns in its response to the May 14th Motion, the government asserts that raising such an issue would not have responded to the issue before the Court which was limited to whether Judge Armijo was biased against Defendants. The government further states that it had no means to investigate the potential leaks, as such an investigation would have required the government to attack opposing counsel by calling them as witnesses or subpoenaing them to the grand jury. According to the government, it was unable to take such action in the midst of a capital case before a judge who was recusing herself.

The period of time between the government's first notice on April 25, 2003 of potential information leaks and its request to the Attorney General on July 1, 2003 for permission to dismiss the New Mexico Indictment does not seem unreasonable, particularly given the fact that the government was engaged in internal meetings and decision-making throughout that period. Nor does it seem unreasonable that the government did not raise the issue of security concerns in the context of the recusal proceedings. Finally, it was not unreasonable for the government to take into consideration the criminal history background of Defendants and the discovery of the alleged plot to murder Detective Maya in assessing the potential impact of information leaks. Regardless of whether Defendants in fact are dangerous or were involved in the murders of the witnesses in the "chop shop" case, it is clear from the history of this case that the government has consistently expressed the view that Defendants pose a significant security risk. Because of the consistency of the government's position, this Court cannot conclude that the government's

allegations regarding Defendants' dangerousness were manufactured solely for the purposes of this motion.

In determining whether the government acted in good faith in bringing the instant Motion to Dismiss, the issue before this Court is not whether Defendants are in fact any more or less dangerous than the defendants in any other criminal case, whether defense counsel in fact solicited confidential information from courthouse personnel or simply were provided such information, whether the potential information leaks disclosed by defense counsel are significant, whether defense counsel would use information received from confidential sources in an unethical manner or whether the District of New Mexico is capable of handling cases of this nature. Before any findings could be made with regard to any of these issues, the Court would need to hold an evidentiary hearing. Because none of these issues is determinative of whether the government acted in good faith in bringing its motion, however, the Court declines to hold such an evidentiary hearing or make any findings with regard to any of these issues.

The only issue before this Court is whether all of the evidence taken together demonstrates that the government had a reasonable basis to perceive that, in the context of this case, the communications between defense counsel and court personnel created security concerns significant enough to warrant dismissal of the New Mexico Indictment. So long as the government had such a reasonable basis for its security concerns, the Court is constrained to find that it acted in good faith in bringing its motion. Given all of the evidence, the Court finds that the government has adequately established that it had a reasonable basis for its security concerns and that despite the suspicion of forum-shopping created by the timing of the motion, it was the security concerns that motivated the government to move to dismiss the New Mexico Indictment.

2.      Arizona Indictment

According to the government, the District of Arizona has venue over all crimes currently

charged in the New Mexico Indictment plus the newly charged crimes in the Arizona Indictment,

while the District of New Mexico does not have venue over the crimes committed solely in

Arizona which were not charged in the New Mexico Indictment.  Thus, the government explains,

the Arizona Indictment consolidates the federal prosecution of Defendants into one judicial

proceeding, thereby avoiding multi-district prosecutions.

The government notes several differences between the New Mexico Indictment and the

Arizona Indictment and argues that these differences are significant.  First, the government points

out that Counts Three and Four of the Arizona Indictment charge Defendants Luis Cisneros and

Armando Alvarado with the substantive racketeering murder of Aaron Romero under 18 U.S.C.

§1959 and the use of a firearm in the commission of that racketeering murder under 18 U.S.C.

§924, both capital offenses.  *See* Arizona Indictment at 15-17.  The New Mexico Indictment had

charged this murder as an act of racketeering, a non-capital offense.  Defendant Luis Cisneros[2]

thus now is charged with two additional substantive crimes for which the death penalty is

possible, making it possible for the jury to impose the death penalty against him for the murder of

Aaron Romero and not do so for the murders of Jose Moreno, Sr. and Jose Moreno, Jr. (the

"Moreno murders").  This was not possible under the New Mexico Indictment.

Next, the government notes that in addition to the Romero murder charges, Counts Five

through Eight and Thirteen through Sixteen of the Arizona Indictment charge the Moreno

---

[2]  As set forth below, the government has represented that it will not seek the death
penalty against Defendant Armando Alvarado.

murders as substantive racketeering murders under 18 U.S.C. §1959, as well as murders for hire under 18 U.S.C. §1958.  *See* Arizona Indictment at 17-19, 21-23.  The government explains that, because of venue reasons, these murders were charged in the New Mexico Indictment only as murders for hire.  The new murder charges and their companion firearm counts are now alleged as capital offenses.

Further, the government states that the Arizona Indictment includes eight new substantive drug counts (Counts Twenty through Twenty-Seven) and three new firearm counts (Counts Thirty through Thirty-Two).  *See Id.* at 28-30, 31-32.  For venue reasons, the government explains, these new counts can be charged only in the District of Arizona.  The government further explains that it did not seek defense counsel's permission to waive venue because of security concerns.

The government also notes that Counts Twenty-Eight and Twenty-Nine of the Arizona Indictment charge Defendants Raymond Llamas, Angel Rivera and Paul Eppinger with conspiracy to retaliate against a witness, Detective Maya, in violation of 18 U.S.C. §§1513(a)(1)(B) and (e), and conspiracy to tamper with Detective Maya, in violation of 18 U.S.C. §§1512(a)(1)(A) and (C) and 1512(k).  *See* Arizona Indictment at 30-31.  Finally, the government explains that the Arizona Indictment charges three new defendants, Benjamin Austin, Richard Trujillo and Francisco Martinez, Jr., whose involvement in the racketeering enterprise dealt more extensively with Arizona than New Mexico.

Defendants counter that the changes in the Arizona Indictment are not significant, as they do no more than recharge the same acts as new crimes under new statutes.  In fact, Defendants contend, the only truly new allegations are those regarding the alleged conspiracy to murder

Detective Maya, which can be brought in a separate Arizona Indictment.  Moreover, Defendants contend that the allegedly new charges contained in the Arizona Indictment are in reality nothing but a "rehashed, recycled presentation" of charges that have been pending in Arizona in one form or another since 2000.  Specifically, Defendants argue that the charges in the Arizona Indictment are a mirror of charges that were brought in two consolidated cases commenced in 2000 in the Superior Court of the State of Arizona in and for the County of Maricopa, one of which involved a criminal syndicate and one of which involved trafficking in marijuana, and in two "chop shop" cases commenced in 1997 and 2000 in Arizona state court in Maricopa County which involved trafficking in stolen vehicles.  Similarly, Defendants assert that one of the new defendants added to the Arizona Indictment, Benjamin Austin, was a defendant in the 2000 criminal syndicate case and thus was already known to the government.  Accordingly, Defendants explain, most of the allegedly new crimes charged in the Arizona Indictment occurred prior to 2000 and the government thus has had notice of these alleged crimes at least since then.  Defendants contend that the fact that the new charges are not really new creates an inference that the Arizona Indictment was motivated not by the government's interest in prosecuting these charges in federal court but rather by the government's desire to create venue in the District of Arizona and divest this Court of jurisdiction over this case.

Defendants also contend that, because several of the new charges represent charges which were charged in state drug and car conspiracies indicted in 1997 and 2000 and dismissed in 1998 and 2001, respectively, dismissal of the New Mexico Indictment in favor of the Arizona Indictment would allow the government to dismiss and re-indict Defendants on the same charges for a third time.  This, Defendants argue, constitutes prosecutorial harassment.

-22-

The Court finds that the government has adequately set forth a reasonable, factual basis for bringing a new indictment in Arizona.  The parties agree that the Arizona Indictment is based in part upon further developments in the government's investigations, i.e., its discovery of the alleged plot to murder Detective Maya, and that the Arizona Indictment charges the Aaron Romero murder and the Moreno murders as violent acts in aid of racketeering, thereby adding new factual elements and new elements of crimes.  A review of the case law demonstrates that it is proper for the government to bring a new indictment based upon further developments in investigations or a new indictment which adds new factual elements or new elements of a crime. *See United States v. Newsome*, 887 F.2d 1088, 1989 WL 123235, \*\*3 (6th Cir. 1989), *cert. denied*, 493 U.S. 1075 (1990) (unpublished opinion) (holding that there is no impropriety in government moving to dismiss one indictment in order to bring another indictment which "increase[s] the prosecution's chances of conviction by adding another factual element to the case."); *United States v. Mendenhall*, 597 F.2d 639, 640 (8th Cir. 1979), *cert. denied*, 444 U.S. 855 (1979) (holding that "a prosecutor is normally free to dismiss one indictment and bring another based on further development of his case."); *United States v. Mejia-Cendejas*, 59 F.3d 177 (9th Cir. 1995), *cert. denied*, 516 U.S. 1059 (1996) (unpublished opinion) (finding no proof that government was seeking tactical advantage or to harass, or was motivated by considerations clearly contrary to public interest, where government stated that it obtained superseding indictment in order to add an element of the crime).  Given this case law, the fact that the government may already have known about the newly added Defendants and the newly added crimes is insufficient to create an inference of a lack of good faith.

Moreover, the fact that bringing the new indictment in Arizona allows the government to charge new crimes and new counts that it is unable to charge in New Mexico further demonstrates that the Arizona Indictment is a good faith reason for the government's Motion to Dismiss.  It in the interest of judicial economy to try all of the charges against Defendants in one case and in one district.  Moreover, it is invaluable to the Court to have before it the whole picture of a case, especially for purposes of sentencing.  If claims are severed and heard by different judges, the result is that the Court sees only pieces of a case.  Under those circumstances, the Court is unable to evaluate accurately the relative roles of participants and the relevant conduct.

Finally, the dismissal and re-indictment of charges that would result from dismissal of the New Mexico Indictment does not rise to the level of prosecutorial harassment.  Indeed, on August 22, 2002, the Arizona state court rejected identical claims made by Defendant Luis Cisneros in denying his motion to dismiss with prejudice an Arizona state indictment against him.

        3.     <u>Practical Considerations</u>

The government contends that Arizona logistically is the more appropriate forum for this case.  According to the government, while the Moreno murders provided the District of New Mexico with a strong interest in prosecuting this criminal enterprise, the criminal conduct this enterprise has already committed and continues to commit in Arizona provides the District of Arizona with the stronger overall interest in the prosecution of this case.

The government sets forth several practical considerations for prosecuting this case in Arizona rather than New Mexico.  First, with regard to witnesses, the government states that it currently estimates that it will call approximately 150 witnesses who reside in the Phoenix area, fewer than five witnesses who reside in Albuquerque, fewer than twenty witnesses from the

-24-

Lovington area and no witnesses from Santa Fe.  The government notes that the time required to drive from Lovington to Lubbock and then fly to Phoenix is not appreciably different from the time required to drive from Lovington to Santa Fe.  Next, the government states that the Cisneros Organization and the New Mexican Mafia are based out of Phoenix, and that most of the criminal conduct at issue in this case occurred within the Phoenix area.  The government also notes that in the most recently alleged murder plot, three defendants allegedly conspired to have an Arizona law enforcement officer murdered within the Phoenix area.  Finally, although the government admits that substantial evidence was transported from Arizona to New Mexico in June 2003, it asserts that this evidence easily can be transported back to Arizona in one U-Haul trailer and that a significant amount of evidence remains in Arizona, including evidence regarding the murder of Aaron Romero, evidence of the alleged plot regarding Detective Maya and evidence that was presented in the Arizona state prosecution of Luis Cisneros.

According to Defendants, the considerations of convenience set forth by the government are not new but rather are considerations that have been in existence since the commencement of this action.  Defendants thus argue that the timing of the government's decision to raise these considerations calls into question both why the government did not previously decide to prosecute this case in Arizona and why the government now seeks to change venue.  Defendants further claim that the government's considerations are disingenuous because, while the prosecution represented in prior cases against Defendants that it intended to call 150 witnesses, it only called approximately twenty witnesses in each such case.  Moreover, Defendants explain, almost all of the Phoenix area witnesses the government intends to call are law enforcement personnel who

more easily can bear the temporary hardship of traveling to present their testimony than can lay witnesses.

The Court recognizes that it would have been more convenient and economical for Defendants and the Court if the government had taken into consideration the issues that it raises now as soon as it was aware of those issues, which well might have been before it commenced the instant action.  Certainly, bringing this matter in the most convenient and practical forum would have been the better course and would have saved both Defendants and the District of New Mexico hardships which inevitably will result from dismissal of this action.

The case law, however, is clear that whether the government acted improperly in commencing an action is irrelevant on a motion to dismiss the indictment.  *See Rinaldi v. United States*, 434 U.S. 22, 30 (1977) (holding that the "salient issue . . . is not whether the decision to maintain the federal prosecution was made in bad faith but rather whether the Government's later efforts to terminate the prosecution were similarly tainted with impropriety."); *United States v. Doody, IV*, No. 01 CR 1059 (SAS), 2002 WL 562644 (S.D.N.Y. Apr. 16,  2002) (rejecting defendant's argument that government's motion to dismiss should not be granted because government acted improperly in commencing the action in the wrong venue; only relevant issue was whether government determined in good faith at time it sought leave to dismiss indictment that alleged offense was committed in Pennsylvania rather than New York and thus that Eastern District of Pennsylvania was proper venue).  Rather, the relevant inquiry is whether the government has set forth proper reasons for moving to dismiss and has provided an adequate factual basis for those reasons.  Here, the government adequately has set forth logistical considerations that support dismissal of the New Mexico Indictment.

-26-

Given the case law, the fact that the government should have known about these considerations earlier is insufficient to create an inference that the government is not asserting these considerations in good faith.  Nor do the allegations set forth by Defendants seem sufficient to show that the government's stated practical considerations are disingenuous.  The government satisfactorily explained its statement that, based on its most recent review of the evidence, it intends to call 150 witnesses from the Phoenix area and that its prosecution will not necessarily be the same as the state prosecutions in Arizona which involved fewer witnesses.  Moreover, the Court is not persuaded that it is any easier for law enforcement personnel to travel than it is for other witnesses.  Finally, there will always be a hardship for some witnesses, regardless of where trial ultimately is held.

B.    Defendants' Allegations of Prosecutorial Harassment

1.    Forum-Shopping

Defendants contend that nothing new happened to spark any of the concerns which the government sets forth as the basis for its Motion to Dismiss.  The only new development, Defendants contend, was the transfer of this case to this Court, which, Defendants note, made rulings "unfavorable" to the government in a prior death penalty case, *United States v. Gonzales, et al.*, No. CR 95-538 (MV).  Accordingly, Defendants argue, the timing of the motion creates an inference that the government's true motivation was to have this case tried before another judge.  Defendants further argue that this inference is strong enough to overcome the presumption of good faith afforded to the government.  In making this argument, Defendants rely on *United States v. Salinas*, 693 F.2d 348 (5th Cir. 1982), arguing that the inference of lack of good faith is as clear here as it was in that case.

-27-

Defendants claim that their position is strengthened by the fact that, until the instant motion, the government's actions consistently demonstrated its commitment to prosecuting Defendants in New Mexico and to having this action proceed as expeditiously as possible.  For example, on June 5, 2003,  federal prosecutors in Arizona moved to dismiss a criminal indictment pending in the District of Arizona that charged Defendant Luis Cisneros with possession of a firearm with an altered or removed serial number and possession of a firearm by a convicted felon. In support of the motion, the government explained that, "Defendant has serious criminal charges pending against him in New Mexico District Court and the United States is seeking the death penalty in connection with those charges.  A conviction in New Mexico thus may render these proceedings unnecessary."  Motion and Order to Dismiss Criminal Indictment Without Prejudice, filed June 5, 2003 in *United States v. Cisneros*, CR No. 00-745 (PHX-SMM).  Similarly, on June 3, 2003, the government transported evidence from Arizona to New Mexico for review by defense counsel.

In addition, in a pleading filed on June 5, 2003, the government argued that inspection of any joint defense agreement was necessary to prevent delay which would occur should some conflict arise which necessitated change of counsel.  Specifically, the pleading stated, "Nothing less than the orderly and timely resolution of this case is at stake."  Government's Reply to Defendants' Response to Motion for Court to Inspect Any Joint Defense Agreement In Camera at 5.  The government's stated interest in moving this case along was consistent with the position it took in several prior pleadings, including its objection to Defendants' request for more time to prepare submissions about why the government should not seek the death penalty, its objection to Defendants' request for an extension of time to provide notices of alibi, its objection to deferral of

-28-

the deadline for its decision regarding whether to seek death against certain Defendants and its request for a scheduling conference setting deadlines and a trial date.

In response to Defendants' allegations of forum-shopping, the government asserts that the timing of the Motion to Dismiss is tied not to the transfer of the case to this Court but rather to the government's discovery both of the potential information leaks and the alleged plot to murder Detective Maya. The government points out that it received notice of the transfer of the case on the very same day that it received a copy of the June 13th Opinion in which Judge Armijo makes findings regarding the possible compromise of courthouse security. Finally, the government contends that Defendants' speculations regarding the government's true motives are insufficient to rebut the presumption of good faith.

As set forth above, the Court agrees with Defendants that the timing of the government's motion creates a legitimate suspicion of forum-shopping. In light of the reasonable, factual basis for the government's motion as set forth in its motion papers, however, the concerns raised by Defendants are insufficient to overcome the presumption that the government acted in good faith and in consideration of the public interest. In deciding the instant motion, the Court is limited to determining whether all of the evidence taken together demonstrates that the government had a reasonable basis for its concerns regarding security, changes in the Arizona Indictment and practicalities. So long as the government had a reasonable basis for its concerns, the Court has no discretion to find that the government lacked good faith in seeking dismissal of the New Mexico Indictment. As set forth above, the Court finds that the government has adequately established that it had a reasonable basis for its concerns. Accordingly, the appearance of forum-shopping created by the timing of the motion is insufficient to overcome the presumption that the

government's request was motivated by reasonable concerns relating to security, changes in the

Arizona Indictment and practicalities.

Moreover, *Salinas*, upon which Defendants rely, is distinguishable from the instant case.

In *Salinas*, the government did not move to dismiss until a recess on the day trial was set to begin,

after the jury has been chosen.  The government provided no reason other than that a superseding

indictment would be sought.  Later, the government admitted that its reason for dismissal was its

displeasure with the selected jury.  The Fifth Circuit found a clear inference of lack of good faith

on the part of the government based upon the government's own statement, and held that "the

Government used Rule 48(a) to gain a position of advantage or 'to escape from a position of less

advantage.'"  *Salinas*, 693 F.2d at 353 (citation omitted).  In the instant case, the government's

motion was made before a trial date or even a motion schedule had been set.  As explained above,

the government has set forth three reasons for its motion, and has provided a detailed factual basis

for each reason.  Further, rather than making statements from which an inference of lack of good

faith can be made, the government attempted both in its pleadings and at the hearing to rebut the

inferences of bad faith raised by Defendants.  Thus, unlike in *Salinas*, Defendants' allegations that

the government is using Rule 48(a) to gain a position of advantage or to escape from a position of

less advantage do not rise to the level of evidence sufficient to rebut the presumption of good

faith.

        2.      <u>Re-exposure to the Death Penalty</u>

Defendants argue that the Arizona Indictment alleges special findings against Defendants

Raymond Llamas and Armando Alvarado that make them death penalty-eligible, despite the fact

that the government already informed them that the Attorney General had decided not to seek the

death penalty against them.  According to Defendants, "to tell two men that they face the death

penalty, then to tell them that they do not, and now to tell them once again that they face

execution is harassment in the most obvious and serious sense of the word."  Defendants'

Amended Response to Motion to Dismiss at 18.

The government, however, has represented that it does not intend to seek the death

penalty against either Defendant Llamas or Defendant Alvarado.  Based on the government's

representation, neither Defendant Llamas nor Defendant Alvarado will be re-exposed to the death

penalty.  Accordingly, the potential re-exposure of these Defendants to the death penalty does not

provide a basis for the Court to find prosecutorial harassment.

3.      Violation of the Rights to a Speedy Trial and to a Speedy Indictment

Defendants argue that the dismissal of the New Mexico Indictment would violate their

rights to a speedy trial and to a speedy indictment.  In support of this argument, Defendants

contend that the government has failed to explain why it is pursuing a new indictment in another

jurisdiction almost one year after Defendants were detained on charges in this case or why it

delayed the initial indictment in this case for over two years, while delaying the Arizona

Indictment for over three years after the discovery of the alleged acts of wrongdoing.  In this time,

Defendants argue, numerous defense witnesses have moved from Lovington to Phoenix, many

Mexican national witnesses may have become permanently lost following re-entry to Mexico and

other defense witnesses have been assigned to "far flung" state and federal penitentiaries.  For this

reason, Defendants argue, the ability of their counsel to investigate essential witnesses has been

prejudiced.

-31-

The case law does not support Defendants' arguments that dismissal would violate their right to a speedy indictment or to a speedy trial.  First, the Sixth Amendment right to a speedy trial does not apply once an indictment is dismissed, since the defendant is no longer subject to trial.  *See United States v. Wallace*, 848 F.2d 1464, 1469 (9th Cir. 1988); *see also United States v. Samples*, 713 F.2d 298, 301 (7th Cir. 1983) ("The Speedy Trial Clause applies only to an accused; when charges were dismissed in Iowa, the defendant lost not only the status of being an accused, he lost the Sixth Amendment's guarantee of a prompt trial.").  The right to a speedy trial thus has "no application to the delay between [the defendant]'s initial arrest and the dismissal." *Wallace*, 848 F.2d at 1469.  Thus, Defendants cannot argue that the delay between their initial arrest and the return of the Arizona Indictment violates their Sixth Amendment right to a speedy trial.

Nonetheless, "[p]re-indictment delay following dismissed charges may . . . be scrutinized under the Fifth Amendment's Due Process guarantee." *Id.*  In order to establish a Fifth Amendment violation, however, "the defendant must show actual, non-speculative prejudice as a result of the delay; and, second, the court must balance the government's reasons for causing the delay against the demonstrated prejudice to the defendant." *Id.* at 1469-70 (citation omitted); *see also United States v. McKim*, 509 F.2d 769, 773 (5th Cir. 1975) ("there is no constitutional right to a speedy indictment; prejudice must be shown").

In the instant case, the Arizona Indictment was returned before the motion for dismissal of the New Mexico Indictment was filed.  Accordingly, there would be no pre-indictment delay following dismissal.  Defendants thus cannot argue that dismissal of the New Mexico Indictment would result in a violation of their Fifth Amendment due process rights.

-32-

4.      Violation of the Right to be Tried in a Proper Venue

Defendants argue that they have a right under the Sixth Amendment and 18 U.S.C. §3235[3] to be tried where the alleged offenses occurred, and that because both indictments at issue here are primarily about the Moreno murders – capital offenses that occurred in New Mexico – Defendants have a right to be tried in New Mexico.

The government argues that §3235 is not applicable here because: Defendants' argument that Arizona does not have venue is not properly brought in the District of New Mexico; proper venue lies in Maricopa County and Lea County, because a significant part of the conspiracy to murder the Morenos occurred in Maricopa County; and it is not possible to try this case in the county where the Moreno murders occurred because there is no federal courthouse in Lea County.  The government further argues that Santa Fe County is not a more appropriate venue than Maricopa County, as none of the alleged criminal conduct occurred in Santa Fe, while almost all of the alleged criminal conduct occurred in Maricopa County.  Accordingly, the government argues, Maricopa County is a more appropriate venue than Santa Fe County.

The government's argument regarding the comparative appropriateness of Maricopa County to Santa Fe County is persuasive.  More importantly, the Court finds that the issue of venue is insufficient to rise to the level of evidence of either prosecutorial harassment or lack of good faith.

_____

[3]  18 U.S.C. §3235, Venue in capital cases,  provides:  The trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience.

-33-

5.      Interference with Defendants' Right to Effective Assistance of Counsel

Defendants explain that for the last two years, they have been developing meaningful and useful relationships with their attorneys and defense teams and that extensive work has gone into assembling teams of professionals, including attorneys, mitigation experts, investigators and forensics.  If the case is dismissed and tried in Arizona, it is unlikely that Defendants' attorneys and defense teams will be able to continue to represent Defendants.  At least three of the defense attorneys have represented that family obligations, work obligations or a combination of both will prevent them from being able to continue to represent their clients if the case is moved to Arizona.  Even for those attorneys who would be able to continue representing their clients, traveling to Arizona to defend this case would take a huge toll, both on their personal and professional lives and on their ability to represent their clients effectively.  More importantly, there is no guarantee that the district court in Arizona would allow Defendants' attorneys to continue their representation, as most of the attorneys are licensed in New Mexico and thus would be out-of-state attorneys.  It would be more costly for the Ninth Circuit to compensate these attorneys than to compensate Arizona attorneys.  Defendants point out that developing and maintaining trusting attorney-client relationships is particularly important here, as this is a case where Defendants are facing either death or the loss of freedom for the remainder of their lives.  Accordingly, they argue, the major disruption in the continuity of representation that dismissal of the New Mexico Indictment will cause presents a grave risk to the effectiveness of Defendants' assistance of counsel.

The Court is mindful of the impact that switching lawyers mid-stream would have in this case.  Even in a non-capital case, it is extremely difficult for a client who has already gone through

interviews, disclosed information and developed a relationship of trust to change lawyers.  In a

case of this magnitude, the difficulties would be even greater and the hardships to Defendants

would be very real.

This is not, however, a case in which the Court has the discretion to weigh the potential

hardships to the parties or to determine which party should bear the burden of the government's

negligence, inattention and indifference to the hardships that its motion might cause.  Rather, so

long as the government's motion is not motivated by the improper purpose of violating

Defendants' right to effective assistance of counsel, the Court is constrained to find that the

motion is made in good faith, regardless of the consequences to Defendants.

First, it does not appear that interference with Defendants' attorney-client relationships is

either a motivating factor behind or the intended effect of the government's motion.  Indeed,

Defendants do not argue as much.  Thus, any interference with Defendants' representation would

be incidental rather than intentional.  As such, the interference would not constitute prosecutorial

harassment.  *See United States v. Wallace*, 848 F.2d 1464, 1468-69 (9th Cir. 1988) (although

defendant contended that dismissal allowed government to achieve an improper tactical advantage

by re-indicting her at a time when she had lost testimony of a witness and government had gained

testimony of another witness, given that prosecutor's stated reason for motion, exploration of tax

violations, did not appear to be a sham, court concluded that defendant's loss of evidence was an

incidental, rather than intended, effect of dismissal and reindictment and that unintentional

advantage gained by prosecution was not improper or improperly motivated).

Moreover, the potential interference with Defendants' attorney-client relationships does

not rise to the level of a constitutional violation.  Case law establishes that while the right to

-35-

effective assistance of counsel "is a fundamental component of the Sixth Amendment, . . . the right to *choose* counsel is not absolute; it must be weighed against the need for an efficient and effective administration of justice." *United States v. Machor*, 879 F.2d 945, 952 (1st Cir. 1989), *cert. denied*, 493 U.S. 1094 (1990). Additionally, "the right to counsel does not involve the right to a 'meaningful relationship' between an accused and his counsel." *Id.* (citing *Morris v. Slappy*, 461 U.S. 1, 14 (1983)). Accordingly, the disruption of the meaningful and useful relationships that Defendants have formed with their attorneys does not constitute a violation of their Sixth Amendment right to effective assistance of counsel.

II.     The Instant Memorandum Opinion and Order Will Not Be Filed Under Seal

"The First Amendment guarantees the right of the press and the public to attend criminal trials and certain preliminary proceedings in criminal cases." *United States v. Gonzales*, 150 F.3d 1246, 1255 (10th Cir. 1998), *cert. denied sub nom.*, *Albuquerque Journal v. Gonzales*, 528 U.S. 1129 (1999). In *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), the Supreme Court established "tests of experience and logic" to determine whether a First Amendment right of access applies to a particular criminal trial related process. The Supreme Court has not ruled on "whether there is a constitutional right of access to court documents and, if so, the scope of such a right." *United States v. McVeigh*, 119 F.3d 806, 812 (10th Cir. 1997), *cert. denied sub nom.*, *Dallas Morning News v. United States*, 522 U.S. 1142 (1998). In both *Gonzales* and *McVeigh*, the Tenth Circuit "assumed without deciding" that the *Press-Enterprise II* analysis applies to requests for access to court documents. *See Gonzales*, 150 F.3d at 1256; *McVeigh*, 119 F.3d at 811.

Under the *Press-Enterprise II* analysis, the "experience" test examines "whether the place and process have historically been open to the press and general public." *Press-Enterprise II*, 478 U.S. at 8.  The "logic" test examines whether "public access plays a significant positive role in the functioning of the particular process in question." *Id.* at 8.  Even if, applying these tests, a qualified First Amendment right of access is found to exist, the right may be overcome "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984).

In the instant Memorandum Opinion and Order, in order to address thoroughly the issues raised by both parties and to present a comprehensive and comprehensible decision, the Court has quoted extensively from pleadings that were filed under seal.  Despite the fact that this decision contains language from sealed documents, applying the *Press-Enterprise II* test, the Court declines to file the instant Memorandum Opinion and Order under seal.  To the extent that the instant decision involves an unprecedented motion to dismiss a death penalty indictment, the "experience" prong of the test cannot be applied.  The subject matter of this decision, however, suggests that it is too important to keep under seal and rather should be open to the press and the general public.  For the same reasons, the "logic" prong of the test is met.  There can be no question that public opinion can and should play a role in the process by which the government takes the unprecedented action of moving to dismiss an indictment in one state and re-filing essentially identical charges against the same Defendants in another state.  Finally, the Court does not find countervailing interests strong enough to override the public interest in access to this decision.  While Defendants justifiably have expressed concern that inflammatory publicity about

Defendants' alleged but unproven violence would interfere with their right to a fair trial in this venue, as a result of the Court's decision to grant the government's Motion to Dismiss, Defendants likely will not be tried before a jury in New Mexico.  Accordingly, there is no compelling concern that public access to the instant Memorandum Opinion and Order would obstruct a fair adjudication of this matter.

## CONCLUSION

As set forth above, the government has met the standard applicable to a Rule 48(a) motion to dismiss.  There has been no evidentiary showing that the government's motion lacks a good faith basis or is contrary to public interest.  Similarly, the evidence does not establish that granting the motion would be inconsistent with the fair administration of justice.  Accordingly, this Court will grant the Motion to Dismiss.  As the Court will grant the Motion to Dismiss, there is no longer any reason for proceedings and discovery to be stayed.  Accordingly, the Motion to Stay will be denied as moot.

**IT IS THEREFORE ORDERED** that United States' Motion to Dismiss Third Superseding Indictment Without Prejudice **[Doc. No. 433]** is hereby granted, and United States' Motion to Stay Proceedings and Discovery **[Doc. No. 432]** is hereby denied as moot.

Dated this 15th day of September, 2003.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Attorneys for Plaintiff:

James Tierney
Gregory Fouratt
Steven Yarbrough

Attorneys for Defendants:

Peter Schoenburg
Brian Pori
Randi McGinn
Natman Schaye
Larry Hammond
Jerry Herrera
Dorothy Sanchez
Kari Converse
Billy Blackburn
Gail Evans
Jacquelyn Robins
Charles Aspinwall
Mark Fine
Scott Pistone
Cathy Love